**<u>EXHIBIT C</u>**

# IRELL & MANELLA LLP

A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

840 NEWPORT CENTER DRIVE, SUITE 400
NEWPORT BEACH, CA  92660-6324
TELEPHONE (949) 760-0991
FACSIMILE (949) 760-5200

1800 AVENUE OF THE STARS, SUITE 900

**LOS ANGELES, CALIFORNIA  90067-4276**

TELEPHONE (310) 277-1010
FACSIMILE (310) 203-7199
WEBSITE:  www.irell.com

**WRITER'S DIRECT**
TELEPHONE (310) 203-7535
FACSIMILE (310) 203-7199
RSchwartz@irell.com

April 11, 2016

**VIA E-MAIL**

Mr. Jason Feazell
JAMS
555 W. 5th Street, 32nd Floor
Los Angeles, CA 90013

Re:    ***Nu Image, Inc. v. Calrissian LP, et al.*, Reference No. 1210033079**:
         **Claimant's Reply to Respondents' Counterclaim [JAMS Rule 9(d)]**

Dear Mr. Feazell:

Claimant Nu Image commenced this arbitration to enforce Respondents'[1] promise to pay the remainder of a $4.1 million "holdback" against a $41 million purchase price that Respondents agreed to pay in August 2014, as part of purchasing a film distribution company, then known as Millennium.[2]  Respondents paid the first portion of that holdback, called a "Non-Contingent Payment," of $900,000, in August 2015.

When the next payment came due, in February 2016, Respondents said that they would not pay it because the Sellers, including Nu Image, had misrepresented two aspects of Millennium's financial condition before the 2014 deal closed.[3]  Tellingly, Respondents had said nothing about these matters when they made the first payment, even though the same information had been available to them then that was available to them in February 2016.

What changed in the interim?  By February 2016, Respondents' mismanagement of Alchemy had turned a once solid business into a financial catastrophe.  Among other things, Respondents forced Alchemy to borrow $15.6 million from its lender, SunTrust Bank, within a few weeks of closing the August 2014 purchase.  Millennium already had $11

---

[1] "Respondents" collectively include Calrissian LP ("Buyer"), Virgo Societas Partnership III (Onshore), L.P., Virgo Societas Partnership III (Offshore), L.P. (collectively, "Buyer Parents"), and Virgo Investment Group LLC ("Virgo").  We refer to their March 28, 2016 letter to JAMS in response to the Nu Image's February 29, 2016 Arbitration Demand and Statement of Dispute ("Statement of Dispute") as the "Response."

[2] The new owners renamed the company Our Alchemy, LLC in January 2015.  For ease of reference, we refer to the pre-acquisition entity as "Millennium" and the post-acquisition entity as "Alchemy."

[3] *See* Statement of Dispute ¶ 9.  Capitalized terms not defined herein, such as "Sellers," are defined in the Statement of Dispute.

8351488

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 2

million in debt on its books at the time of close, so this additional loan more than doubled the company's debt. Even worse, instead of using the funds to run the company, they transferred the cash *to their own accounts* and used it for their own purposes. That left Alchemy's balance sheet in materially worse condition. Even so, SunTrust did not lend that much money without conducting its own diligence of Millennium's financial condition. It found none of the "irregularities" that Respondents now claim.

Respondents' profligate foolishness didn't stop there, however. Within a few months, they decided to buy two more companies, ANconnect, which distributed DVDs, and Anderson Digital, which provided video on demand and streaming services. "As one insider put it, '[Respondents] basically bought the farm on the DVD business.'"[4] Alchemy borrowed even more to make those acquisitions, counting on the cash flow from the businesses to sustain Alchemy's operations. When these acquisitions sputtered after Respondents bought them, Alchemy teetered on insolvency.

To deal with these self-inflicted disasters, over the last few months Alchemy has been selling off assets at fire sale prices and firing its employees to cut its overhead.[5] That wasn't nearly enough. To save cash, Respondents sought to avoid making any more of the Non-Contingent Payments to Nu Image by cooking up claims that two of Millennium's executives, who remained with the company after the acquisition, had misstated the company's financial condition before Respondents bought it.[6] The baselessness of those assertions is summarized in Nu Image's Statement of Dispute.

On the misguided theory that the best defense is a good offense, Respondents have gone "all in" on their invented claims. Desperate to come up with *something*, of the tens of thousands of transactions, revenue items, costs, and assets and liabilities reflected in Alchemy's financial records, Respondents have managed to identify only *four* items that, they say, justify their failure to make the Non-Contingent Payments: (1) Millennium intentionally understated its return reserves; (2) Millennium understated its liability to producers for participation payments; (3) Millennium improperly recognized revenue for an amendment to the distribution agreement for the film *Killing Season*; and (4) a stub audit for a period after the close until the end of 2014 revealed misrepresentations by Millennium of its pre-closing financial statements. Each of these grounds is meritless.

---

[4] *See* Eric Kohn, "How the DVD Business Is Destroying Alchemy," *Indiewire*, 2/17/2016, available at  http://www.indiewire.com/article/how-the-dvd-business-is-destroying-alchemy-20160217.

[5] *See, e.g.*, Dave McNary, "Indie Distributor Alchemy Hit With 40 Layoffs," *Variety*, 2/17/2016, available at http://variety.com/2016/film/news/alchemy-layoffs-indie-distributor-1201708723.

[6] *See*, *e.g.*, Statement of Dispute ¶ 14.

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 3

### 1.    **Return Reserves**

***Millennium did not deliberately underestimate return reserves.***

As explained in paragraph 3 of the Statement of Dispute, a significant portion of Millennium's revenue was generated by the distribution to retailers, such as Wal-Mart and Target, of motion picture DVDs.  Retailers have the right to return that product at any point in time if they are not able to sell it.  The returns right is perpetual.  In other words, retailers can return an unsold DVD three months after receiving it or five years, or more, after receiving it.  To anticipate that possibility, Millennium established a reserve based on management's estimate of the percentage of DVDs that retailers would return.[7]  Respondents claim that Millennium's management purposefully understated that reserve before the purchase closed, to make the company's finances look better.

There is no factual basis for that assertion.  To invent one, Respondents contend that Millennium typically conducted "soft" monthly financial closes and "hard" quarterly financial closes, and that the June 2014 quarterly review process resulted in "a $2.6 million increase to the return reserve per the Company controller's … recommendations."  Response at 3.  However, they allege that Millennium's CFO, John Avagliano, rejected this recommendation and increased the reserves by a smaller amount, $1.6 million, which, according to Respondents, somehow produced "a $1.1 million shortfall."  *Id.*

None of these allegations is supported by Exhibit 1, which is the sole evidence cited for the claim.  The document does not establish that Mr. Avagliano believed that a $2.6 million reserve was justified, or that he thought the $1.6 million reserve amount was unreasonable.  In fact, the numbers $2.6 million and $1.6 million do not even appear in the document.  And even if Respondents' assertions are taken at face value—although nothing indicates that they should be—they would prove only that the CFO of the company, Mr. Avagliano booked a very substantial increase in the reserves.  Those are not the actions of someone who is trying to "cook the books."

---

[7]Although we do no not need to rely on this point, because Respondents' allegations are factually wrong, for Respondents' misrepresentation claims to have even arguable legal merit, the alleged misrepresentation must be one of *fact*.  Even if the Tribunal were to treat a return reserve as a "statement" concerning a film distributor's financial condition, a failure to have reserved a high enough amount cannot constitute such a statement.  That is because, at most, a reserve for returns of product is no more than a *prediction* of *future* events and is therefore a non-actionable statement of *opinion*.  *See Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 607-08, 172 Cal. Rptr. 3d 218, 229 (2014) ("an actionable misrepresentation must be made about past or existing facts; statements regarding future events are merely deemed opinions"); *Cansino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469-70, 169 Cal. Rptr. 3d 619, 626 (2014) ("Statements or predictions regarding future events are deemed to be mere opinions which are not actionable.").

**IRELL & MANELLA LLP**
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 4

Furthermore, Respondents pretend as though the reserve estimate is simply an arithmetical calculation involving only quantitative issues. Far from it, the reserve is management's best predication based on a number of factors and based on input from several sources. Thus, the company's sales force may be aware that there are special advertising promotions around certain films in the coming months that would lead to an adjustment to the reserve. As of June 2014, summer, Black Friday, and holiday promotions were already planned for some of the Millennium titles. And while the return reserve is sometimes adjusted from one point in time to another, whether a film title ultimately will be successful cannot be determined until six to nine months after it is distributed. Only at that point will the distributor, such as Millennium, know how many copies of a given title the retailers have actually returned. And only then can the distributor accurately gauge the percentage of DVDs that it thinks are likely to be returned in the future from those retailers. The process that management followed in calculating return reserves was the same process that management followed even if the company had not been put up for sale.

Another significant problem with Respondents' return reserve accusation is that all of the information that was available to Mr. Avagliano was available on a transparent basis to Respondents, and they brought in industry experts to evaluate it. For example, at the end of June 2014, nearly two months before Respondents closed the deal, they and their third party professionals, including the accounting firm Baker Tilly Virchow Krause, received historical actual and anticipated future returns for each of the titles that had been distributed at that time. Respondents do not claim that any of the historical information is inaccurate, and they were fully capable of analyzing it to predict future returns and reasonable reserves, or of asking their professionals to do that for them if, for some reason, they were unfamiliar with this basic aspect of the DVD distribution business they were about to pay $41 million to buy. Neither Respondents nor their advisors said anything about the reserves at that time. And six months later, when they made the first Non-Contingent Payment of $900,000, even with the benefit of that hindsight on the level of *actual* returns, Respondents did not say that the reserve had been set too low—much less, that it had been set too low *intentionally*.

### The email between John Avagliano and Bill Lee <u>disproves</u> Respondents' fraud claim

Seizing on what they think is a smoking gun, Respondents attach an email between John Avagliano and Bill Lee that, they say, "reveals their joint intent to manipulate the numbers to avoid having Buyer walk from the transaction." *See* Response at 4 & Exhibit 2. That's just more reckless rhetoric. Respondents' characterization of the email is contradicted by that very document. On the face of the document, Mr. Avagliano states that "Virgo and Baker Tilly *both have the June numbers*" and that Millennium's estimate already "adjusted June down so the variance isn't too bad." Mr. Avagliano states that, if the July numbers are equally bad, that "will be another challenge" because, apparently, the numbers in Millennium's forecast had not been adjusted as significantly for July.

8351488

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 5

Nothing in these documents states that Mr. Avagliano or Mr. Lee sought to conceal anything. In fact, they demonstrate just the opposite: that they knew that Respondents would receive the actual July numbers and would be able to compare them to management's forecast. Before Respondents closed the deal, they received those July numbers and were aware of the variance from management's expectations. Here again, they said nothing.

Respondents' baseless attempt to blame Mr. Lee and Mr. Avagliano for "intentionally fraudulent actions to represent the Company's financial performance in a false light,"[8] Response at 2, makes no sense. Both were experienced executives who remained with Millennium after the acquisition. Mr. Lee was the CEO of Millennium before the acquisition and remained the CEO of Alchemy afterwards. Mr. Lee had almost 40 years of experience as a senior executive across multiple retail platforms, including as Chief Merchandising Officer at Blockbuster Entertainment and as President and a Board member of Mosaic Sales Solutions, which provided sales and merchandising services for a number of major corporations, including Disney and Wal-Mart. Mr. Avagliano was the COO and CFO of Millennium at the time of the acquisition and remained at Alchemy after the deal closed. Mr. Avagliano had prior experience as CFO of Warner Brothers Home Entertainment (which included responsibility for its home video and DVD revenues) and as CFO of two publicly traded video distribution companies.

Contrary to Respondents' accusations, *see* Response at 2 n.4, neither Mr. Lee nor Mr. Avagliano had any reason to defraud Respondents. Mr. Lee joined with Virgo to acquire Alchemy. If Respondents' accusations were correct, Mr. Lee would have been defrauding himself.

As for Mr. Avagliano, he received no compensation as a result of the sale of Millennium. And in terms of his motivations, he asked Respondents to buy equity in the Alchemy—hardly the conduct of someone who thought he was materially misstating that company's financial condition to the owners of a business whose ranks he wanted to join.

Moreover, Mr. Lee and Mr. Avagliano had a strong incentive to make the pre-closing projections as accurate as possible—or, at a minimum, not to inflate them—given that they would receive bonuses if the actual year-end results exceeded those projections.[9]

---

[8] Respondents' need to invent a claim for fraud is driven by Section 7.3(c) of the Purchase Agreement, which bars them from recovering any amount that Buyers already have paid Sellers absent fraud in connection with the transaction. *See* Statement of Dispute at 2 no. 12.

[9] *See* Purchase Agreement Ex. B-1, § 3.1.1 ("The Executive shall be eligible for a bonus (an 'Annual Incentive Bonus') based on actual company EBITD performance for each completed calendar year commencing January 1, 2014 over the base EBITD forecast for such calendar year on the basis specified in Exhibit A-hereto").

8351488

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 6

***The Sellers did not make any representation about Millennium's future earnings***

Respondents contend that, due to misrepresentations about these return reserves, an additional $4.8 million return reserve was created after the closing, as a goodwill accounting item, and that this resulted in a material variance between Millennium's projected 2014 EBITDA in June and its full year 2014 EBITDA. As explained below, in the discussion of the allegations relating to the stub audit, the adjustment to which Respondents refer was a consequence of something else, namely, the GAAP-required purchase accounting method. Under GAAP, Alchemy's auditors were required to restate the fair value, *as of year-end*, of the assets that Buyers acquired. To the extent that $4.8 million was added to goodwill, this was an adjustment by the auditors to reflect the fair value of the assets based on events that occurred *after* the closing, from August through December 2014.

This also underscores a critical point: The Sellers never represented that there would be no adjustment to fair value as part of a year-end audit. Nor did the Sellers make any representation about the company's future earnings. Respondents contend that "[g]iven certain concerns which did surface in the diligence process," Virgo demanded that Sellers make certain representations in the Purchase Agreement. Response at 2-3. That much is correct. But Respondents misstate the facts in suggesting that Virgo demanded that the Sellers warrant that Millennium's *post*-closing, *actual* 2014 EBITD or EBTDA performance would be equal to management's *pre*-closing EBITD or EBITDA *projections*. Sellers never made such a representation. Given that they were losing control over the company more than four months before the end of the fiscal year, they were in no position to do so.

2.   **Participation Liability**

Respondents say that Millennium understated its participation liability. "Participation liabilities" are monies that Millennium would owe a producer if a film was more successful than anticipated.[10] Thus, it is hard to understand why Respondents would complain about *understated* estimates of participation liability. If Alchemy owed producers more in participation payments than it had anticipated, Alchemy would have more earnings for that title than it had anticipated.

_____

[10] For most motion picture titles that Millennium distributes, it pays the owner of the film, usually its producer, a "minimum guarantee" for the distribution rights. This is an up-front amount that Millennium pays to the producer, regardless of how the film performs. If the film generates revenues sufficient to cover the minimum guarantee and other contracted-for costs, the distributor (Millennium) will pay the producer a contractual percentage of such "overages." Respondents refer to such overages in their filing as "participations." As used in this context, that term should not be confused with "participation" payments that a studio often agrees to pay actors, writers, and directors. Respondents are not referring to such talent compensation when they use the term "participations" here. They are referring to "overages" Millennium pays the producer, if the film outperforms the minimum guarantee.

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 7

In any event, here again, Respondents have mischaracterized the documents that they attached to their Response.  Exhibit 3 and 4 are statements of participation expenses on certain films, based on their then-*current* distribution results, without taking into account actual or projected returns.  In other words, these documents reflect the participation expenses that would need to be paid for those films only if *none* of the retail outlets returned *any* of the DVDs that they had received.  That would have been unprecedented in the history of video distribution.

That aspect of this issue highlights the absurdity of Respondents' counterclaims.  They want to have it both ways:  On the one hand, they claim to have been defrauded because returns were under-projected.  On the other hand, they claim to have been defrauded because, without taking into account the actual returns, which were higher than projected, the company's participation liability was fraudulently understated.

Moreover, even if Exhibit 3 reflected a recommendation by the controller with respect to final participation expenses for a group of films—it does not—Exhibit 4 could not reflect "booking" of those liabilities, because the films listed in the email on Exhibit 3 are different than the films listed on the spreadsheet in Exhibit 4.  Exhibit 3 cannot be compared to Exhibit 4.

Finally, as with the return reserves, before Respondents bought Millennium, they had access to the company's participation agreements with producers and to the historical financial information about the sales of Millennium's films.  They and their accountants and valuation consultants were capable of estimating future participation expenses and questioning Millennium's forecasts if they believed that the forecasts were unrealistic.  But here, too, neither Respondents nor any of their experienced advisors ever said anything about those expected expenses.

**3.**      **Revenue Recognition**

Respondents claim that Millennium engaged in "aggressive" revenue recognition by improperly booking an amendment to the distribution agreement for *Killing Season*.  Response at 5.  They contend that this item "was reversed post-closing."  *Id*.  Respondents are mistaken, and they know it.  Shortly before Respondents closed their deal to buy Millennium, Nu Image, which produced, *Killing Season* needed Millennium to make a number of concessions to the deal.  Millennium agreed.  But in return, Nu Image agreed that Millennium could increase the distribution fee—the share of revenue that Millennium would retain—from 20% to 50%.  *Killing Season* was released in July 2013 and was one of Millennium's most successful titles.  The change in the distribution agreement was retroactive to the release date, which resulted in a significant positive contribution to Millennium's revenue.

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 8

What are Respondents' complaining about?  Millennium initially booked the additional fees as of the date that the change was made to the distribution agreement.  But as part of purchase accounting at the end of the year, the company believed that it was better to reflect the higher distribution fee in the ultimates for *Killing Season* so that the revenue was recognized over the life of the film.  This had no net commercial effect on the company or its finances.  This is a non-issue.

Respondents raise a separate revenue issue.  They identify a post-closing transaction that occurred in December 2014 in which, they claim, Mr. Lee and Mr. Avagliano presented an illegitimate shipment of product to the Board of Directors.  Because the transaction occurred in December 2014, long after the close, it has nothing to do with this dispute. Moreover, as with its other claims, Respondents' characterization of the transaction is not accurate.

Here are the facts:  Alchemy had excess DVD product in 2014 that one of its subdistributors tried to sell to Dollar General Market, a retail chain.  Alchemy had confidence in this subdistributor, as it had successfully sold other Millennium titles to Dollar General.  Alchemy shipped the product to Dollar General, hoping to get Dollar General to market the titles in early 2015.  Dollar General rejected the product at the price Alchemy requested.  Alchemy would not accept the lower price and took the product back.  This had no impact on Alchemy, other than it was unable to obtain hoped-for revenue from the sale of excess product.  Regardless, nothing about this could constitute a defense to Respondents' payment obligations to Nu Image or a counterclaim against Nu Image.

**4.    The Stub Audit**

Respondents contend that a stub audit that BDO performed for the roughly four months of 2014 after they purchased Millennium "revealed a distressed entity with materially different financials than had been disclosed and represented in" due diligence. Response at 5.  Here again, Respondents have misstated the facts.

At the end of 2014, in consultation with its lender, Sun Trust, Respondents hired BDO, its previous auditors, and Salem Partners LLP, an investment bank specializing in film assets, to audit the company's books for the four months in 2014 that Respondents owned the company.  The accounting rules that Millennium was required to use under GAAP in the ordinary course of its business to record the book value of assets were different than the "purchase method" accounting rules that Millennium was required to use after the acquisition to record the fair value of the assets.

Under the purchase method of accounting, BDO was required to adjust the book value of each of the acquired assets to their fair values at the time of the acquisition to

8351488

IRELL & MANELLA LLP
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 9

establish their cost basis for tax purposes.[11]  These adjustments were based on a requirement
that all the company's assets, including, for example, its distribution agreements with
retailers, be valued.  Also, of greatest significance here, the adjustments were based on
events that occurred between August and December 2014—that is, events that were not
known at the time of the close but were known before the end of the fiscal year.  The $41
million purchase price was then allocated over all the acquired assets.  Generally speaking,
if there was any increase in the value of the assets, a corresponding decrease would be made
to goodwill, and any decrease in value of the assets would be reflected by an increase in
goodwill.

       As Respondents knew when they signed the Purchase Agreement, Millennium
expected that a substantial portion of its 2014 revenue would be generated from four titles
that Millennium was distributing during the stub period, August 18-December 31: *Fading
Gigolo*, a John Turturro comedy co-starring Woody Allen and Sharon Stone; and three Nu
Image films: *Stonehurst Asylum*, a thriller starring Michael Caine and Ben Kingsley, among
others; *Automata*, a science fiction film starring Antonio Banderas; and *Good People*, a
thriller starring James Franco and Kate Hudson.  *Fading Gigolo* was released to the home
entertainment market shortly before the close.  The three other films were released after
Respondents bought Millennium.

       As Respondents also knew before the deal closed, Millennium had paid significant
minimum guarantees to the owners of each of these films.  Millennium anticipated that the
films would be successful—otherwise, Millennium would not have acquired the distribution
rights to them.  Unfortunately, none of these titles turned out to be successful, and the DVD
returns for each of them were higher than anticipated.[12]

       In addition, one month after Respondents bought Millennium, in September 2014,
Wal-Mart announced that it was immediately, and significantly, reducing the space in each
store where DVDs were offered for sale.  This led to an increase in returns for product, after
Respondents completed their purchase of Millennium, which no one had anticipated.  The
impact of changing consumer demands as reflected by the decision of Wal-Mart and other

---

       [11] *See* Statement of Financial Accounting Standards No. 141 (rev'd 2007), available
at http://www.fasb.org/cs/BlobServer?blobkey=id&blobwhere=1175820919432&
blobheader=application/pdf&blobcol=urldata&blobtable=MungoBlobs.

       [12] The difference between the profitability of *Killing Season* and *Fading Gigolo* in
the home video market illustrates the difficulty in calculating return reserves at the outset of
distribution.  *Killing Season* generated virtually no revenue in its theatrical release but, as
noted above, has been extremely successful in the home video market.  *See* http://www.the-
numbers.com/movie/Killing-Season#tab=summary.  *Fading Gigolo* generated substantial
revenue in its theatrical release but generated little revenue in the home video market.  *See*
http://www.the-numbers.com/movie/Fading-Gigolo#tab=summary.

Irell & Manella llp
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 10

retailers to devote less retail space to DVD sales was felt not only by Millennium but also by its competitors.  For example, the stock of Cinedigm Corp.—a major competitor in the DVD distribution market—which was trading at $2.15 at the time of the acquisition, has fallen to 20 cents.  *See* https://www.google.com/#q=cidm+stock+price.  In addition, Entertainment One exited the DVD distribution market in early 2016 given the margin pressures of the business.

BDO completed its audit and provided it to Alchemy in June 2015.  Salem Partners valued each of the hundreds of titles as of the acquisition date.  It made an upward adjustment to some of Millennium's titles, such as *Killing Season*, and a downward adjustment for others, such as *Fading Gigolo*.  Respondents were aware of all these adjustments as of that date.  In other words, assuming that BDO adjusted the fair value of the assets of Millennium in the manner that Respondents allege on pages 4 and 5 of the Response, Respondents knew this in June 2015.  As Respondents admit, they made the first Non-Contingent Payment of $900,000 two months later, on August 24, 2015, without raising any issues concerning the acquisition or the adjusted basis of the acquired assets.  If Respondents truly believed that any of the matters that they now point to justified their refusal to pay the remaining purchase price, they would have been revealed in the BDO audit or the Salem Partners asset valuation, and Respondents would have jumped on those findings to withhold the August payment.  None of that happened.  Respondents said nothing, because that audit found nothing amiss.

### Respondents' Refusal To Make The Non-Contingent Payments Has Nothing To Do With Millennium's Pre-Acquisition Financial Condition

What happened between August 2015, when Respondents made the first Non-Contingent payment, and February 2016, when they refused to make the second Non-Contingent Payment, had nothing to do with the sale of Millennium or any representations in connection with it.  Rather, in July 2015, Alchemy acquired the film distribution assets of ANconnect and Anderson Digital.  It also made a deal with ARC Entertainment to distribute ARC's family movie titles.  These deals were financially disastrous for Alchemy.[13]  In February 2016, it had to lay off 40% of its workforce.[14]  That is a sad state of affairs.  But Alchemy's financial problems are not Claimant's responsibility, and they provide no defense to their payment obligations here.

---

[13] *See* Kohn, supra note 4 (stating that by the end of 2015, as a consequence of these acquisitions, Alchemy was in "a liquidity crisis that now threatens its entire future").

[14] McNary, supra note 5 ("Troubled independent distributor Alchemy has pink-slipped about 40 employees — about 40% of its staff — on the heels of a disappointing performance by its slate of films.").

**IRELL & MANELLA LLP**
A REGISTERED  LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 11

Respondents recognize that their claims are weak, and they defend their failure to come up with anything meatier by saying that they "just now" realized that Alchemy's earnings were less than they had anticipated.  *See, e.g.,* Response at 2 (referring to Alchemy's current investigation); *id*. at 6 (referring to "limited information" uncovered "to date").  On the contrary, even if Respondents had no ability to understand their business during the year-and-a-half that they have owned it, Respondents were fully aware of the facts related to every claim in their Response by no later than June 2015, by which time they had received reports concerning Alchemy's financial performance from three professional firms: Baker Tilly, BDO, and Salem Partners.  The first time they raised any issues concerning financial representations in connection with the acquisition was in February 2016, seven months later, and after they had made those fatal acquisitions.

\* \* \* \* \*

Respondents, including Virgo, are sophisticated businesses.  They aggressively pursued their purchase of Millennium.[15]  Before buying the company, Respondents and the seasoned professionals that they retained performed six months of due diligence.  They saw every bit of financial information about Millennium that they had requested.  They do not contend otherwise now.

Respondents have no colorable basis for refusing to pay the Non-Contingent Payments, totaling $4.1 million, let alone a basis for accusing Millennium of fraud. Respondents should be ordered to make those payments immediately.

Pursuant to Sections 8.9 and 8.11 of the Purchase Agreement, Claimant is entitled to recover its reasonable attorneys' fees and costs without any showing that the dispute is exceptional or was raised in bad faith.  Even if that higher standard did apply, however, it would be satisfied here, as Respondents have failed to establish any good faith basis for withholding the amounts that they agreed to pay.

## RESPONSE TO AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

### Affirmative Defenses

Respondents have asserted 14 boilerplate affirmative defenses.  They have stated no facts to support any of them, and thirteen of them have no application to this dispute:

- Claimant has clearly stated a claim against Respondents (first affirmative defense);

---

[15] Contrary to Respondents' assertion (Response at 1), there was substantial interest in Millennium from other potential buyers.

8351488

**IRELL & MANELLA LLP**
A REGISTERED LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 12

- Respondents acknowledge that Sellers did not make any misrepresentations, Response at 2 n.4, so defenses of estoppel, waiver, unclean hands, fraud, and in pari delicto are inapplicable (second, third, eleventh, twelfth affirmative defenses);

- Claimant has not consented or agreed to Respondents' decision to withhold the Non-Contingent Payments, so the defenses of consent, ratification, and acquiescence are baseless (fourth, fifth, and thirteenth affirmative defense);

- As demonstrated above, Respondents' actions are without any justification whatsoever (sixth affirmative defense);

- Claimant immediately made its demand for arbitration after Respondents indicated that they were withholding payment, so it is inexplicable how Claimant has failed to mitigate its damages (seventh affirmative defense);

- Claimant cannot possibly be unjustly enriched by recovering the amount that Respondents owe under the Purchase Agreement (eleventh affirmative defense); and

- The injury suffered by Claimant—including incurring attorneys' fees and costs—is caused by Respondents' unjustified actions in withholding the Non-Contingent Payments, so the defense of lack of causation is meritless (fourteenth affirmative defense).

Respondents plead the affirmative defense of setoff (eighth affirmative defense), but this is the same as the issue in dispute: whether Respondents are entitled to offset the Non-Contingent Payments under Section 7.3(b) of the Purchase Agreement. They clearly are not.

For the foregoing reasons, Respondents have not stated any valid affirmative defense to Claimant's claims.

### Counterclaims

Claimant responds to each of the counterclaims by reference to the paragraph number in Respondents' Response.

29.     Claimant incorporates by reference its February 29, 2016 Demand for Arbitration and Statement of Dispute and the contents of this letter.

30.     Section 7.1 of the Purchase Agreement speaks for itself and is the best evidence of its contents. Responding to footnote 7 of paragraph 30, Claimant admits that Respondents need not name each Seller in the counterclaim and that neither Nigel Sinclair

I R E L L  &  M A N E L L A  LLP
A REGISTERED  LIMITED LIABILITY LAW PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

Mr. Jason Feazell
April 11, 2016
Page 13

nor Guy East made any misrepresentations and asserts that none of the Sellers made any
misrepresentations to Respondents or any of them.

31.    Section 7.3 of the Purchase Agreement speaks for itself and is the best
evidence of its contents.  Claimant denies that Buyer is entitled to withhold any Non-
Contingent Payments.

32.    Section 7.4 of the Purchase Agreement speaks for itself and is the best
evidence of its contents.  Claimant denies that Respondents are entitled to withhold any
Non-Contingent Payments that they have not made, to recover any Non-Contingent
Payments that they have made, and to recover any damages.

33.    Article 4 of the Purchase Agreement speaks for itself and is the best evidence
of its contents.

34.    Claimant denies that Millennium provided any materially false and
misleading financial information of any kind.  Millennium's actual 2014 EBITDA was less
than management projected for reasons that were unknown to management at the time of the
close and outside of management's control.  The Sellers made no representations that
management's projections would reflect actual 2014 EBITDA, and Respondents do not
contend otherwise.

35.    Claimant denies paragraph 35 in its entirety.  Millennium did not withhold or
misstate any financial information to Respondents.

36.    Claimant admits that an actual controversy exists but denies that Respondents
have any basis for withholding the 2nd, 3rd, and 4th Non-Contingent Payments.

37.    Claimant denies that Respondents have stated any basis for any claims for
indemnity, breach of contract, fraud, or declaratory relief.

Claimant further denies that Respondents are entitled to any relief.

This Reply is submitted without prejudice to any other claims, rights, damages, or
defenses that Claimants may have or seek against Respondents, all of which are expressly
reserved.

Respectfully submitted,

Robert M. Schwartz
for IRELL & MANELLA, LLP

cc:    John R. Loftus

8351488